Filed 8/11/14  P. v. Ortega CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTONIO CINCO ORTEGA,<br><br>    Defendant and Appellant. | G047989<br><br>(Super. Ct. No. 09WF0727)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard F. Toohey, Judge.  Affirmed.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anthony DaSilva and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Antonio Cinco Ortega appeals from his conviction for attempted murder, conspiracy to commit murder, and mayhem. He contends the trial court erred by (1) excluding evidence he contends supported a third party culpability defense; and (2) denying his proposed jury instruction on third party culpability. We find no error and affirm his conviction.

FACTS & PROCEDURE

In the early morning hours on March 3, 2009, Rick Sharpski was brutally attacked outside his apartment complex by a machete-wielding assailant. The prosecution's case, in a nutshell, was that the attacker was Ortega, who was trying to kill Sharpski at the behest of Sharpski's wife Mary Sharpski (Mary) and Ortega's close friend Michael Shores. Shores lived with the Sharpskis, and he and Mary were romantically involved.

*Prosecution Case*

Before sunrise on March 3, 2009, Tung Vo was opening his business located next to the Valley Park Apartments in Fountain Valley where Sharpski and his family lived. He heard someone moaning from the other side of the wall. Vo and a co-worker ran toward the complex. He saw a person using a stick-like object continuously hitting someone lying on the ground. Vo yelled out to stop and that he was going to call police, and the man with the stick ran off toward the apartment complex. The man with the stick was wearing dark clothing. Vo called 911.

Apartment complex resident Brian Michael Olsen woke up that morning around 5:30 to the sound of somebody screaming for help. He looked out his window and although it was still dark, he could see one or two people in dark clothing moving in circular motions in the alley. He heard one man yelling for help and saw what appeared to be a hand go up and come back down and heard a sound like metal striking the pavement. One of the men was screaming the entire time. Olsen called the police and when he looked out the window again he saw the two men run down the sidewalk and

2

turn toward an apartment. He then saw the two men at the back gate, the one being chased fell into a bush in an area of dirt, and the other jumped on him and appeared to be punching him. The attacking man was wearing black or dark long pants and a long sleeved shirt. When Olsen heard a voice call out "I'm calling the police[,]" the attacker got up and left.

Olsen's brother was also awakened by the sound of screaming. He heard clanging metal and looked out his window, which faced the opposite direction of his brother's. He saw a Hispanic man wearing a tank top, windbreaker and jeans, running back and forth in the parking lot in front of the hospital next door. He saw a maroon-colored car with tinted windows idling in the road by the alley. When the screaming stopped, he heard someone yell, "'You fucking white boy.'"

The first police officer to arrive at the scene found Sharpski lying on the ground moaning. He was covered in blood and there was blood all over the ground. Shores was standing over Sharpski. The officer checked the area for fleeing suspects but found none. Sharpski was wearing a FedEx uniform. He was missing several fingers, bleeding profusely, and asking the officer to help him. Shores was not responsive to the officer, his hands were clenched in fists, and he was pacing back and forth. Shores denied seeing who had attacked Sharpski. Sharpski did not know who had attacked him but said his attacker was wearing a black jacket and black pants. As a result of the attack, Sharpski was hospitalized for three months—two weeks of it in a coma—had multiple surgeries, and at the time of trial in 2012 was still in a wheelchair and needed nursing assistance.

Sharpski's daughter, Ashley Sharpski (Ashley) was 16 years old at the time of the attack. She testified about the family dynamic. Her father worked for FedEx as a delivery person. Her mother, Mary, was unemployed. Ashley had two younger siblings. The family lived in two-bedroom apartment. Ashley described her father as a physically

3

and emotionally abusive alcoholic who, although he financially supported the family, was not there for them emotionally.

In Fall 2008, unemployed 40-year-old Shores, who had been living in another apartment in the same complex, moved into the Sharpskis' apartment. He shared the children's bedroom, but according to Ashley, her mother and Shores were "dating," wanted to be together, and were talking about getting married. Ashley was pleased about this because Shores had become a father figure to her and her siblings, and it meant she would "finally have . . . a father who wasn't going to call [her] names or be mean to [her] or drink all the time."

Ashley knew Ortega, who was a friend of Shores. She saw him frequently in the common areas of the apartment complex. Ashley had been to Ortega's house, and he had been to the Sharpskis' apartment a few times. Ashley considered him to be like a big brother.

Ashley testified to various conversations she overheard about hurting her father. One day in October 2007, when Sharpski had been particularly drunk and abusive, Ashley went with her mother to the apartment complex laundry room to see Shores, who was there with Ortega. Another man named Johnny Price was also there. Mary said she wished Sharpski would die, to which Ortega said they could take care of it for her. Mary said, "No, don't do that[,]" and then giggled and said she was not serious.

In April 2008, before Shores moved in with Ashley's family, Ashley was in the kitchen of Shores' apartment when she overheard Ortega and Price in the bedroom. They were talking about hurting Sharpski while he was in his work uniform and making it look like an accident or robbery so Mary could get money to take care of the children.

In December 2008 or January 2009, Ashley was in Ortega's car with Ortega and Shores, who were again talking about hurting Sharpski. One of the men said "it needs to be quick and painless and fast and easy. Shores said, "'I just wish [Sharpski]

4

would die.'" Ortega agreed and said they should slit Sharpski's throat. Ashley never told her father about any of the conversations because she did not think anyone was serious.

April Bivens was Ortega's girlfriend from 2004 to 2009, and she frequently spent the night at Ortega's home. She admitted at trial she had been a methamphetamine user, and was testifying at trial under an immunity agreement with regard to her involvement in this matter. Bivens knew Mary through Ortega and Shores, and was friendly with her but did not spend time alone with her. She did not know Mary and Shores were more than friends. Both Ortega and Shores frequently told Bivens about Sharpski's alcoholism and his abuse of Mary and the children, and it was a common topic of conversation among them.

A year or two before the March 3, 2009, attack on Sharpski, Ortega told Bivens he was going to attack Sharpski to protect the children. About six months before the attack, Ortega told Bivens that Mary and Shores were going to pay him $5,000 to "'off'" Sharpski and they would let Ortega come live in the apartment with them. Ortega said that for insurance purposes the attack had to happen when Sharpski was going to work, and Shores and Mary would let him know when Sharpski left for work. Ortega bought a machete and told Bivens it was for attacking Sharpski.

A week or two before Sharpski was attacked, Ortega told Bivens about an "aborted attack on [Sharpski]." Ortega said he had gone with his friend John Canvin, but "[Canvin] got too sketched out and couldn't do it."

Bivens testified she spent the night at Ortega's house on March 2, 2009. Ortega told her that he was going to "Mikey's" (i.e., Shores') apartment complex in the morning to "'take care of business.'" Bivens understood that to mean Ortega was going to kill Sharpski. Ortega set the alarm for four hours after they went to bed, and when Bivens woke up at 5:30 a.m., he and his car were gone. When it got light out, Ortega came home. He was standing in the bedroom doorway saying, "'April, I need your help.'" Ortega was wearing long black pants, a black shirt, black shoes, a baseball cap

5

and gloves. He asked for her help getting his gloves off and they were covered with blood. He had a large cut on his left middle finger, which April helped him clean and bandage.

Ortega told Bivens that he waited for Sharpski to come out of his apartment and attacked him with the machete. He tried to hit Sharpski in the throat to stop him from screaming, but Sharpski just kept fighting back. Ortega ran away when he heard someone yell they were calling the police. Ortega sent Bivens to get his cell phone from his car. She saw blood on the trunk of the car, the exterior and interior of the door, and the driver's seat. Ortega said he would wash the blood off the machete in the shower so he could keep it in his sword collection. Ortega and Bivens took the clothes Ortega had been wearing and burned them up in the backyard fire pit. They did laundry and washed the sheets and any other items of potential evidence. Bivens then left for work.

On April 2, 2009, Ortega was arrested for the attack on Sharpski and interviewed by police. The police also questioned Bivens at her house that same day. Although she at first tried to protect Ortega, when she realized she could be in trouble for helping him destroy evidence, she agreed to cooperate. Ortega, apparently unaware the police had talked to Bivens, called her immediately after he was interviewed. The police were with Bivens when Ortega called. The conversation was recorded and played for the jury. During the call, Ortega said fingers were being pointed at him for "something that I didn't do[,]" and he was now "the fall guy." Ortega asked Bivens to go to his house and wait for his mother in case he was not able to call her. Ortega asked Bivens to "clear out everything in my room for me. You know exactly what I'm talking about. Behind the dresser." He asked Bivens to get her diary to see what she wrote because the police did not believe he was with her. Bivens testified that when Ortega called her and asked her to remove things from his room, she understood him to mean she should get rid of his sword collection. She assumed the machete he used in the attack was behind the dresser.

Bivens told the police about Ortega's request and they said they had already searched Ortega's house. Bivens went there anyway to see if the machete was there. When she got there, the bedroom appeared to have been searched—furniture and other items had been moved and the closet doors were open. Bivens gathered about 10 swords, knives and daggers that the police had not taken. When she tried, unsuccessfully, to move the dresser, which was inside the closet, she heard something fall—a machete she assumed had been taped to the back of the dresser. Bivens had not seen the machete there before and did not see Ortega place it there. She put all the knives and the machete in the trunk of her car and took them to the police.

Investigators collected evidence from the crime scene and from Ortega and his bedroom. The profile obtained from a drop of blood found at the crime scene was consistent with Ortega's profile. A pair of Ortega's shoes had bloodstains on them, one of which had a profile matching Sharpski's profile, and bloody shoe prints found at the crime scene, were consistent with Oretga's shoes. The backyard fire pit at Ortega's residence contained ash from black and gray burnt items including different types and colors of fabric.

Swabs were obtained from the blade of the machete Bivens handed over to the police. One sample found near the hilt tested positive for blood and was submitted for DNA extraction. Jennifer Jarrett, a forensic scientist at the Orange County Crime Lab, conducted the testing and analysis of the sample and compared it to samples obtained from Sharpski, Ortega, and Canvin (the man Ortega said had accompanied him on the earlier aborted attempt on Sharpski). Jarrett determined the profile developed from the machete was a mixture consisting of at least three people including two main contributors and a trace minor contributor. The major profiles were consistent with Ortega and an unknown female. Jarrett concluded Canvin was excluded as a contributor, but Sharpski could not be excluded.

Thomas Fedor, a forensic serologist, was asked by the prosecution to review the Orange County Crime Lab DNA testing results and reports. He agreed there were two main contributors to the DNA found on the machete, one of them an unknown female and opined Ortega could be a contributor. In his opinion letter, Fedor questioned the assumption there were only two major contributors and thought the results could also point to more than two. Fedor believed Jarrett's conclusion there were only three contributors of DNA on the machete swab was reasonable, but it was not the only possible conclusion. He agreed Sharpski could be one of the minor contributors. Fedor's opinion letter stated if one did not assume there were only three contributors, then Canvin could also be a minor contributor. Fedor reviewed the results from the other swabs from the machete. As to those swabs, he agreed there were multiple contributors of DNA, and Ortega, Sharpski, and Canvin were each potential contributors.

*Defense Case*

Ortega's mother, Cynthia Roberts, testified Ortega lived with her, her husband, and her sister, and he was a peaceful person. Ortega collected replica swords and knives from movies. The machete found in his bedroom was not part of his collection. Roberts considered Bivens to be a dishonest person. On the night of March 2, 2009, Roberts heard Ortega and Bivens in Ortega's bedroom. There were no other noises during the night. When she got up by about 5:30 a.m., Ortega's car, a green Nissan, was parked in its usual spot in the street. Roberts heard Ortega in the bathroom around 6 a.m., and heard water splashing in the bathroom sink. She left for work by 7:10 a.m. without seeing Ortega or Bivens.

Ortega's aunt testified she knew Ortega well and considered him a peaceful person. She awoke around 7 or 7:15 a.m. on March 3, 2009, and did not hear any loud noises in the house between 5:45 and 6:30 a.m. She went to the kitchen. A few minutes later, Ortega came out in a bathrobe and talked to her, and there was nothing unusual about his demeanor. The aunt did not notice a cut or bandage on Ortega's hand at the

8

time but did notice a bandage some time thereafter. Ortega mentioned he was going to make a fire outside. The aunt went back to her bedroom, and when she came out, Ortega and Bivens were cuddled up together in the backyard by the fire. She could not see what they were burning.

Shores' younger sister testified she had been best friends with Ortega for the past 14 years. She considered Ortega to be a non-violent person. She had been friends with Bivens in high school and considered Bivens to be a dishonest person. Another long-time female friend of Ortega's also testified she considered him to be a non-violent person.

*Charges, Verdict, and Sentence*

Ortega, Shores, and Mary were jointly charged with attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664, 187, subd. (a))[1] (count 1), conspiracy to commit murder (§ 182, subd. (a)(1))(count 2), and mayhem (§ 203) (count 3). Great bodily injury and personal use of a deadly weapon enhancements were alleged as to Ortega (§§ 12022.7, subd. (a), 12022, subd. (b)(1)). Ortega, Shores, and Mary were tried together, but when the jury was unable to reach a verdict, a mistrial was declared. The court granted the prosecution's motion to sever, and Ortega's retrial began in October 2012. The jury convicted Ortega of attempted willful, deliberate, and premeditated murder (count 1), conspiracy to commit murder (count 2), and mayhem (count 3), and found the great bodily injury and personal use of a deadly weapon allegations true. The trial court sentenced Ortega to 25 years to life in prison for conspiracy (count 2), plus consecutive terms of three years for great bodily injury enhancement and one year for personal use of a deadly weapon enhancement.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

DISCUSSION

## 1. Exclusion of Evidence Canvin Owned a Machete

Ortega argues the trial court abused its discretion by excluding evidence that Canvin possessed a machete that was similar to the one used to attack Sharpski. We find no error.

We begin with some additional factual and procedural background. As already discussed, Bivens testified that a few weeks before the March 3, 2009, machete attack on Sharpski, Ortega told her about having taken his friend Canvin with him to attack Sharpski, but Canvin backed out and the mission was aborted. Fountain Valley Police Detective Adam Hertenstein testified for the prosecution he was one of the officers who investigated the attack on Sharpski. In the course of the investigation he participated in obtaining DNA samples from Sharpski and Ortega in March 2009. In May 2011, Hertenstein obtained a DNA swab from Canvin. During the defense case, Ortega's counsel indicated he intended to recall Hertenstein to question him about having seen and photographed a machete Canvin had in his possession in May 2011. Counsel argued evidence Canvin owned a machete similar to the one used to attack Sharpski was relevant to establish third party culpability. Counsel argued there was evidence Canvin could not be excluded as a minor contributor of DNA on the machete used in the attack on Sharpski. That DNA evidence combined with Bivens' testimony about the earlier aborted mission to attack Sharpski was "sufficient evidence that . . . Canvin is the one that did it . . . ." Counsel also argued the fact the police did not take and test Canvin's machete demonstrated bias in the investigation.

In objecting to the evidence on relevance and Evidence Code section 352 grounds, the prosecutor mentioned that in Ortega's first trial evidence had been offered that when Hertenstein interviewed Canvin, he asked if Canvin had ever borrowed a machete from Ortega, to which Canvin said, "no, he didn't need to borrow a machete to

10

chop weeds at his house because he already owns a machete" and the machete Herenstein photographed was just an old rusty machete; "I don't know how long he's owned that."

The trial court excluded the evidence. It commented it had reviewed Hertenstein's police report containing Canvin's statement about owning a machete, and "to permit that testimony regarding . . . this other machete . . . is clearly irrelevant. You take the context of the witness's statements to the officer, it would become more clear just how misleading and how irrelevant that testimony is. [¶] People keep referring to the first trial. I heard the first trial, and including [Ortega's] testimony that he had been at the scene the evening before and had a nose bleed, and basically putting himself at the scene and explaining his blood, that is uncontroverted, was at the crime scene location. And I just, this proffer of third-party culpability is, the court sustains the objection under [Evidence Code section] 352. [¶] . . . [¶] I'm majoring [*sic*] the third[]party culpability in terms of the threshold that has to be established to permit that evidence. [¶] This machete that's found in his possession, long after the fact, that he's indicated he wouldn't need to borrow a machete because he had his own, to put him with this machete in front of a jury would be totally in a vacuum, totally inappropriate under [Evidence Code section] 352, and I'm not going to permit it."

In *People v. Hamilton* (2009) 45 Cal.4th 863, 914, the Supreme Court explained: "'[T]he standard for admitting evidence of third party culpability [is] the same as for other exculpatory evidence: the evidence [has] to be relevant under Evidence Code section 350, and its probative value [cannot] be "substantially outweighed by the risk of undue delay, prejudice, or confusion" under Evidence Code section 352.' (*People v. Kaurish* (1990) 52 Cal.3d 648, 685, citing *People v. Hall* (1986) 41 Cal.3d 826, 833 [(*Hall*)].) 'To be admissible, the third-party evidence need not show "substantial proof of a probability" that the third party committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's

11

possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' ( . . . *Hall*, *supra*, 41 Cal.3d at p. 833.)" A trial court's exclusion of such evidence is reviewed for an abuse of discretion. (*People v. Robinson* (2005) 37 Cal.4th 592, 625-626.) And any error in excluding such evidence is reviewed under the test set out in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), because generally the trial court's application of the ordinary rules of evidence does not impermissibly infringe on the accused's right to present a defense. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611-612.)

The trial court did not abuse its discretion by excluding evidence that over two years *after* Sharpski was almost hacked to death with a machete, Canvin possessed a different machete. The evidence was not relevant. "[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt, must link the third person either directly or circumstantially to the *actual perpetration* of the crime." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325, italics added.) The evidence did not link Canvin to the March 3, 2009, machete attack on Sharpski. The machete used to attack Sharpski was found in Ortega's room within a month of the attack. Ortega sent Bivens to collect that machete after he was arrested and told her it could be found behind his dresser. DNA testing revealed Ortega was a major contributor to the DNA found on his machete and Sharpski, the victim, could not be excluded as a minor contributor. Although Fedor (who did not actually conduct the DNA testing but reviewed the results) suggested Canvin could also have been a minor contributor to the DNA found on *Ortega's* machete that does not make evidence Canvin possessed a similar machete two years later relevant. All it suggests is that Ortega's friend Canvin may have at some time come in contact with *Ortega's* machete.

Even were we to agree Canvin's possession of a different machete two years after the attack on Sharpski was relevant, its exclusion was harmless. Ortega argues that while the evidence pointing to him "as Sharpski's assailant was strong, it was not overwhelming." We disagree with that characterization. The evidence was overwhelming. Sharpski's daughter testified to three conversations she overheard Ortega having with Shores and others about killing Sharpski. Bivens testified to Ortega's discussions with her about his plans to kill Sharpski for Shores and Mary and having bought a machete for that purpose. Ortega told Bivens about his earlier aborted mission to carry out the attack. The night before the attack, Ortega told Bivens he was going to Shores' apartment complex in the morning to "'take care of business'" which she understood to mean Ortega was going there to kill Sharpski. Ortega set the alarm and in the early morning he was gone. When he returned his gloves were covered with blood, there was blood in his car, he had a cut on his hand, and he told Bivens that he was going to wash the evidence off the machete in the shower. He told Bivens about having tried to slit Sharpski's throat to silence him during the attack, but Sharpski kept getting up. After taking a shower, Ortega and Bivens washed all the linens. Witnesses to the attack described the assailant as wearing dark clothing; Bivens testified Ortega was wearing dark clothing when he returned in the morning, which they burned. When Ortega was arrested, he asked Bivens to go get everything from his room, telling her in particular to get what was behind the dresser, which is where she found the machete.

Moreover, the forensic evidence was compelling. Ortega's blood was found at the crime scene. Bloody footprints at the crime scene were consistent with shoes found in Ortega's room and, significantly, Sharpski's blood was on those shoes. Ortega's and Sharpski's DNA was on the machete found in Ortega's bedroom taped behind the dresser. Fibers from black and gray fabric were found in the ashes of the backyard fire pit at Ortega's house. Ortega points out that at his first trial (when he was tried jointly with Shores and Mary) the jury was unable to reach a verdict—implying that this was a

13

close and difficult case for the jury to decide.  We observe that at *this* trial, which lasted seven days, the jury deliberated for only two hours before returning their verdict finding Ortega guilty on all charges, and finding all enhancement allegations to be true, and during deliberations the jury made no inquiries or requests of the trial court.  (*People v. Robertson* (1982) 33 Cal.3d 21, 36 [short jury deliberations likely reflected strength of prosecution's case].)  In view of the overwhelming evidence of Ortega's guilt and the ease with which the jury reached its verdict, it is not reasonable probable it would have returned a more favorable verdict had the evidence of Canvin's ownership of a machete been admitted.

*2. Failure to Instruct on Third Party Culpability*

Ortega contends the trial court erred by refusing his requested jury on third party culpability.  We reject his contention.

Ortega requested the jury be given the following instruction he composed concerning third party culpability:  "You have heard evidence that a person other than the defendant committed the offense with which the defendant is charged.  The defendant is not required to prove the other person's guilt.  It is the prosecutor that has the burden of proving the defendant guilty beyond a reasonable doubt.  Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt.  Evidence that another person committed the charged offense may by itself raise a reasonable doubt as to the defendant's guilt.  However, its weight and significance, if any, are matters for your determination.  If after considering all of the evidence, including any evidence that another person committed the offense, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty."  The trial court rejected the proposed instruction.  We cannot say it erred.

"'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.'  [Citations.]"  (*People v. Souza* (2012) 54 Cal.4th 90, 115.)  "The trial

14

court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case. [Citation.] Evidence is 'substantial' only if a reasonable jury could find it persuasive. [Citation.] The trial court's determination of whether an instruction should be given must be made without reference to the credibility of the evidence. [Citation.] The trial court need not give instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)

Ortega argues his requested instruction correctly pinpointed his defense theory that someone else—specifically Canvin—committed the attack on Sharpski. We reject his contention. The evidence did not support giving the instruction because it did not support an inference Canvin committed the March 3, 2009, attack. The only evidence was Ortega's boast to Bivens, made several weeks before the attack, that he had once gone to attack Sharpski and took Canvin with him, but Canvin "got too sketched out and couldn't do it[;]" and Fedor's testimony that based on his review of the DNA testing results, if one did not assume there were only three contributors to the DNA found on Ortega's machete (i.e., Ortega, unknown female, and Sharpski), Canvin could not be excluded as a fourth contributor.

Moreover, even if the trial court erred by not giving the instruction, the error was harmless. *People v. Earp* (1999) 20 Cal.4th 826, 887 (*Earp*), applying the reasonably probable standard of *Watson*, *supra*, 46 Cal.2d 818, 836-837, considered the trial court's refusal failure to give a similar instruction which stated: "'Evidence has been offered that a third party is the perpetrator of the charged offense. It is not required that the defendant prove this fact beyond a reasonable doubt. In order to be entitled to a verdict of acquittal, it is only required that such evidence raise a reasonable doubt in your minds of the defendant's guilt.'" The Supreme Court held the trial court's refusal to give that instruction was harmless, stating, "[e]ven assuming that this proposed instruction accurately pinpointed the defense theory, defendant suffered no prejudice from the trial

15

court's refusal to give it. The jury was instructed under CALJIC No. 2.90 the prosecution had to prove defendant's guilt beyond a reasonable doubt, and the jury knew from defense counsel's argument the defense theory that [a third party], not defendant, had committed the crimes. Under these circumstances, it is not reasonably probable that had the jury been given defendant's proposed pinpoint instruction, it would have come to any different conclusion in this case. [Citation.]" (*Earp, supra,* 20 Cal.4th at p. 887.)

In *People v. Hartsch* (2010) 49 Cal.4th 472, 504, the Supreme Court explained why third party culpability instructions are generally ineffective: "We have noted that similar instructions add little to the standard instruction on reasonable doubt. [Citation.] We have also held that even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. [Citation.]" (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1277 [holding trial court did not err by denying defendant's request for third party liability theory instruction when counsel never offered proposed language, but "[i]n any event," omission of such an instruction was not prejudicial in light of reasonable doubt instruction given to jury].)

In *People v. Gutierrez* (2009) 45 Cal.4th 789, 825, the Supreme Court held that although the defendant testified others were responsible for the victim's death, any error in not giving a third party culpability instruction was harmless because "[t]he jury was instructed on reasonable doubt and burden of proof, and could have acquitted defendant had it believed defendant's testimony."

Here, even assuming the trial court erred by refusing to give the jury the proffered instruction, any such error was harmless under any standard. (Compare *Watson*, *supra*, 46 Cal.2d at p. 836 with *Chapman v. California* (1967) 386 U.S. 18, 24). The jury was instructed on reasonable doubt and the burden of proof in the form of

16

CALCRIM No. 220, and circumstantial and direct evidence in the form of CALCRIM Nos. 223, 224, and 225. As in *Earp, supra,* 20 Cal.4th at page 887, the jury knew from Ortega's trial counsel's closing argument the defense theory was that the charged offenses were committed by another person and not by Ortega. Counsel argued the jury had to be convinced beyond a reasonable doubt Ortega was the assailant, Canvin and Price were potential perpetrators, and Canvin's DNA could not be excluded as a minor contributor to the DNA found on Ortega's machete. And as already explained above, the evidence in this case overwhelmingly established Oretga's guilt. A further instruction concerning a third party's culpability would not have had any effect on the outcome of the trial.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


ARONSON, J.


17